IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs February 3, 2025

IN RE DAYSON A.[1]

**Appeal from the Juvenile Court for Hardin County**
No. 23-JV-59      Daniel L. Smith, Judge
_____

No. W2024-00874-COA-R3-PT
_____

Mother appeals the termination of her parental rights. The trial court found three grounds for termination: abandonment by failure to visit, abandonment by failure to support, and failure to manifest an ability and willingness to assume custody. The trial court also concluded that terminating Mother's parental rights was in the child's best interest. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

JEFFREY USMAN, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and J. STEVEN STAFFORD, P.J., W.S., joined.

Jamie L. Davis, Adamsville, Tennessee, for the appellant, Tonica A.[2]

Jonathan Skrmetti, Attorney General and Reporter; and Allen T. Martin, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

**OPINION**

I.

This appeal concerns the termination of Tonica A.'s (Mother) parental rights to

---

[1] It is the policy of this Court to protect the privacy of children in parental termination cases by avoiding the use of full names.

[2] In the trial court, Mother was also sometimes referred to by her maiden name. For the purposes of this appeal, we refer to Mother by her legal name.

Dayson A., who was three years old as of the date of trial in the present case. The Juvenile Court for Hardin County found that the Tennessee Department of Children's Services (DCS) proved three grounds for termination against Mother and Mason W. (Father) by clear and convincing evidence. The trial court also concluded that terminating Mother's and Father's parental rights was in Dayson's best interest. Father did not appeal the termination of his rights, but Mother did. Accordingly, this opinion is focused upon review of the trial court's termination of Mother's parental rights.

Dayson was born in March 2021 in Jackson, Tennessee. Dayson, who had been exposed to drugs by Mother during her pregnancy, was born premature and spent approximately 45 days in a neonatal intensive care unit (NICU). He struggled to gain weight during this period.

This was not Mother's first experience with using drugs, nor is Dayson the first child as to whom Mother has lost custody. In 2011, Mother "lost custody of two (2) children due to [her] drug use." Mother has an extensive history of drug abuse and has been imprisoned on multiple occasions. The timeline of Mother's imprisonment, however, is somewhat unclear. Mother testified at trial that she frequently went back to "jail a lot trying to expirate the sentence." In 2017, Mother pleaded guilty to the illegal sale of methamphetamine, a Class B felony offense, and received a ten-year prison sentence. Mother spent six months in prison before being released to supervised probation. DCS witnesses suggested at trial that Mother was separately convicted of aggravated child abuse, but the trial court made no findings on this point. Mother returned to custody at some point prior to May of 2020 and was imprisoned again sometime on or before May 2023 for violating the terms of her release. Mother remained imprisoned from that time through the date of the trial of this matter. According to Mother, her ten-year sentence was set to expire in February 2025.

While Dayson struggled in the period after his birth, specialists affiliated with LeBonheur Children's Hospital developed a suspicion that Dayson's post-birth symptoms might have been indicative of cystic fibrosis.[3] Mother was asked to bring Dayson back to LeBonheur after his release from the NICU for additional testing. She failed to do so.

DCS offered referrals to service providers related to Mother's drug problem. Mother did not follow through as to any of the services recommended through DCS referrals. However, she did comply with some of DCS's original requests to complete drug tests. Shortly after Dayson's birth, Mother failed a urine drug screen on May 5, 2021,

---

[3] "Cystic fibrosis is a progressive, genetic disease that affects the lungs, pancreas, and other organs." *About Cystic Fibrosis*, Cystic Fibrosis Foundation (last accessed May 13, 2025), available at https://www.cff.org/intro-cf/about-cystic-fibrosis. Depending on the organs affected, cystic fibrosis can lead to infections, inflammation, respiratory complications, digestive difficulties, and other lifelong side effects. *Id.*

testing positive for "BUP." Mother told DCS that "she had a prescription" for "BUP" "but [did] not produce the prescription." Mother then passed a urine drug screen on May 12, 2021. However, DCS thereafter "received a new report on May 21, 2021, again alleging drug exposure by the mother. [Mother] and the child were also reported to be living with a known drug user." When DCS located Mother again on June 30, she reportedly refused to complete a drug screen.

Mother had been directed by her parole officer that "she could not live anywhere other than [her] grandparents' home, unless he had approved it." Mother and Dayson did reside in that home at various points between his release from the NICU and Dayson entering into DCS's custody in July 2021. For example, DCS found them together at Mother's grandparents' home during a June 30, 2021, visit. Mother suggested during her testimony that she spent some time residing with Father and at least a week residing "with [her] mom's boyfriend." A history of violence existed between Mother and Father, and she indicated that he had previously raped her.

In July 2021, officials with LeBonheur contacted DCS to report that Dayson had not returned for his cystic fibrosis testing. This prompted an investigation into Dayson's and Mother's whereabouts. DCS found Mother and Dayson at an address located on Lonesome Pine Road, which reportedly belongs to her uncle. After being admitted to the dwelling by an unknown individual, DCS discovered Mother unconscious with Dayson in her arms. Mother did not initially respond to DCS's verbal cues. She "had to be shaken and yelled at to be awaken[ed]." Dayson had a visible "purple mark on the back of his neck, approximately the size of a dime and what appeared to be bug bites on his legs." DCS took Dayson to Hardin Medical Center for evaluation. Mother accompanied Dayson, but reportedly "walked off upon arrival" and did not make herself available to DCS in the immediate aftermath. Mother did not share her whereabouts with DCS after leaving the medical center but testified at trial that she went to live with Father at this time.

Upon completing testing at LeBonheur, Dayson was diagnosed with cystic fibrosis. Dayson's current foster mother, M.R.B.[4] (Foster Mother), testified at trial that Dayson's particular symptoms associated with his cystic fibrosis diagnosis included trouble eating, pancreatic deficiencies, and other complications that impact his lungs and kidneys. Dayson was forced to use a gastronomy tube, referred to at trial as Dayson's "G-tube," to supply him with his daily nutritional needs. DCS officials testified at trial that Dayson's condition requires him to attend multiple appointments every month with specialists to evaluate his progress. Foster Mother also explained that "he has to do a shaker vest 20 minutes a day with three different breathing treatments" and regularly supplements his diet with enzymes to assist with digestion. Dayson's condition is quite serious and requires regular medical attention.

---

[4] Foster Mother testified under an alias.

After Dayson's diagnosis and entry into DCS custody, the Juvenile Court declared him to be a dependent and neglected child. Considering Dayson's drug exposure, his cystic fibrosis, Mother's inability to give him proper care, and the reports of domestic violence between Mother and Father, the Juvenile Court concluded that Dayson should remain in DCS's custody and ordered Mother to comply with any permanency plans created by the department.

Under her permanency plans, Mother was obligated to: (1) comply with the terms of her "parole," attend each of her court dates, and clear all of her criminal charges while incurring no new charges; (2) obtain an independent source of transportation; (3) use Southwest Transportation Services in the interim by notifying DCS at least three days in advance of a need for coordinated transportation; (4) complete mental health services through Quinco or Lifespan; (5) complete parenting classes; (6) complete a LARC class and participate in the CHANT program, which are both conducted by the Hardin County Health Department; (7) attend Dayson's cystic fibrosis appointments in order to learn how to assist him with managing his condition; (8) complete four hours per month of therapeutic visitation with Dayson in addition to virtual visits to be completed via a smart phone; and (9) continue to receive negative drug screens while completing an alcohol and drug assessment through Health Connect America. While the permanency plans do not mention Mother's support obligation, the Juvenile Court also ordered Mother to pay approximately $105 per month to support Dayson's upbringing.

Dayson spent approximately two months in between hospitals after arriving in DCS's custody before transitioning into his first medically sensitive foster care placement through Youth Villages. Dayson eventually shifted to another placement before finally arriving into Foster Mother's care.

Mother struggled to comply with her permanency plan requirements. Mother asserted that Youth Villages cut off in-person visitation due to the coronavirus pandemic, but other witnesses countered Mother's recollection on this point. Regarding support, Mother made three payments of $105 each: one in August, one in October, and one in November of 2022. After November 2022, Mother made no additional child support payments and provided no other support. Mother explained at trial that she had been working at the Moose Lodge but lost that employment due to her criminal conviction. Mother also mentioned that she worked at Hillbilly's Wing Shack, but did not specify how long her employment there continued. Mother confirmed at trial that she was not imprisoned between December of 2022 and the date the termination petition was filed in April of 2023, yet she did not visit Dayson or send him any support payments during that period.

With regard to transportation, Mother testified at trial that her driver's license had been suspended due to "a lot of unpaid fines from where I've been in trouble in the past." The only potential vehicle that she could have made use of was Father's van, but, given

her unlicensed status, she never personally took the van to visit Dayson. DCS understood Mother's transportation difficulties and, as noted above, contracted with Southwest Transportation Services to give Mother a consistent opportunity to visit Dayson on her own time, provided she informed DCS about her desire to do so three days in advance so it could coordinate with Southwest. DCS representatives testified at trial that Mother made use of the Southwest Transportation Services option once, but never again. Accordingly, Mother's last in-person visit with Dayson took place on January 25, 2022.

DCS filed the instant termination petition on April 10, 2023. As grounds for termination, DCS raised abandonment by failure to visit, abandonment by failure to support, and failure to manifest an ability and willingness to assume custody of Dayson. Finally, DCS alleged that terminating Mother's parental rights to Dayson was in his best interest. Mother answered this petition, denying the existence of all three grounds and raising the affirmative defense of lack of willfulness with regard to the abandonment grounds.

DCS served this petition on Father on April 28, 2023, at his personal residence but struggled to find Mother. DCS sought to find Mother at Father's residence and with various family members and friends. Mother's probation and parole officer with the Madison County Sheriff's Office told DCS that Mother was "in absconded status and . . . ha[d] active criminal warrants and [wa]s hiding from their office and from law enforcement." Mother was eventually served with the termination petition on May 10, 2023, at the Hardin County Jail.

The trial court heard the termination of parental rights case on March 20, 2024. At the outset of trial, the trial court denied DCS's request to amend its pleadings to include a severe child abuse ground. DCS submitted more than thirty documents into evidence, including Mother's permanency plans, documents from the dependency and neglect proceedings, and Mother's judgment related to her guilty plea for the sale of methamphetamine. The trial court heard testimony from Jessica Johnson, a foster care team leader employed by DCS, Brianna Hendrix, one of Dayson's family service workers, Foster Mother, and Mother. Father did not testify.

Several witnesses provided more details about Dayson's well-being generally and his cystic fibrosis specifically. Foster Mother spoke positively about Dayson's progress after coming into her family's care. Specifically, she explained,

> [w]hen we first got him, he wouldn't eat by mouth. He was just real sick, real congested. He had a feeding tube. But he no longer has the feeding tube anymore. He's very healthy. He's gained weight. He's made a huge turnaround.

While Foster Mother and her family are "very cautious" with Dayson's condition, she also

explained the efforts that she and her family have taken to give Dayson good quality of life while managing his condition. Foster Mother's husband is a worship pastor, and the family frequently attends church with Dayson. They make a point to take Dayson to the YMCA to try and engage in various physical activities and socialization. At the time of trial, the family had taken Dayson on vacation to the beach. Ms. Hendrix corroborated this testimony, noting that, in her visits with Dayson, he enjoys playing with toys and doing other outdoor activities. Foster Mother testified that with her husband she raises Dayson alongside her two sons. Dayson refers to Foster Mother as "Mother" and his foster father as "Dada." He calls one of Foster Mother's sons "Bubba," and is "all the time wanting to go places with his [B]ubba." Foster Mother opined that Dayson has become "extremely bonded" with them as well as Foster Mother's extended family, that she treats Dayson as one of her own, and that the family planned to adopt Dayson if the trial court terminated Mother's and Father's parental rights. When asked at trial about whether Foster Mother would be able to continuously support Dayson through his day-to-day needs and his struggles with cystic fibrosis, Foster Mother guaranteed the court that they would "do everything it takes."

Mother testified that, after Dayson left her custody, she and Father secured permanent housing and obtained jobs, but the trial court found Mother's testimony with respect to having a stable housing situation to not be credible. Mother also argued that DCS purposefully placed Dayson in foster care placements that were a significant geographical distance away and that this made it impracticable for her to see Dayson. However, the trial court found this testimony to also be lacking in credibility in part due to the documentation provided by DCS that Mother had been given access to Southwest Transportation Services and had utilized that service at least once. Significantly, Mother conceded at trial that she has not participated in any of Dayson's medical appointments related to his cystic fibrosis. She had not learned anything about how to care for a child with Dayson's severe condition.

After hearing the testimony and reviewing the documentary evidence, the trial court terminated Mother's parental rights. The trial court made extensive findings of fact in support of its ruling. Regarding both abandonment grounds, the trial court identified December 2022 to April 2023 as the relevant period for analysis. Regarding visitation, the trial court concluded that Mother visited Dayson "zero times" during that period, and that her last visit with Dayson was in January of 2022, which was nearly a year before the operative period. Noting Mother's testimony that her failure to visit was not willful because of her transportation challenges, the trial court found her testimony to not be credible. DCS had made transportation available to Mother, which she previously made use of but which she claimed DCS no longer provided. The trial court instead found that Mother simply "made no attempt to contact DCS concerning visitation [in the] four (4) months prior to the filing of the petition." Additionally, the trial court concluded that DCS had endeavored to set up visits by phone and communication by letter, but that Mother had failed to contact Dayson by these means. The trial court also found that Mother was neither

incapacitated nor imprisoned during the relevant period, concluding that she had simply failed to visit during this time. Ultimately, the trial court concluded that the evidence was clear and convincing that Mother had abandoned Dayson by failure to visit.

The trial court made similar findings regarding Mother's failure to support. The trial court concluded that "no payments were made during the four months immediately preceding the filing of the petition." Addressing Mother's contention that her failure to support was not willful, the trial court noted her previous payments totaling $315 dollars prior to the critical four-month period before filing of the petition. The trial court observed that $2,625 dollars should have been paid. Additionally, the trial court found that Mother "is abled-bodied and capable of working and earning enough to support herself as well as paying child support." The trial court noted that Mother herself had "testified that she was capable of supporting the child during the periods that she was released from incarceration." The trial court concluded that Mother "was not in jail or incapacitated in the four months preceding the filing of the petition, and she could have worked and supported the child." Accordingly, rejecting her lack of willfulness defense, the trial court found clear and convincing evidence that Mother had abandoned Dayson by failure to support.

The trial court also addressed the failure to manifest an ability and willingness to assume custody ground. Related to ability and willingness to assume custody, the trial court found that Mother "does not have a home for the child." Despite Mother's insistence that she will be able to provide safe and stable housing after release from incarceration, the trial court found her testimony to be lacking in credibility. The trial court also determined that Dayson had only lived with Mother for four months of his life before being removed and that Mother "has taken no affirmative steps to regain custody of her child." Instead of taking actions to regain custody, the trial court concluded that Mother has "violated her probation/parole and is presently incarcerated." The trial court also noted Mother's failure to provide support for Dayson. The trial court observed that while Mother "asserts that she desires to assume legal and physical custody of her child, her desires do not match her actions and more so, her ability to do so."

Regarding the risk of substantial harm, the trial court noted that Dayson's cystic fibrosis is "a chronic, life-threatening medical condition" and that Dayson requires twice daily treatments and must attend regular doctor's appointments. The trial court noted Mother "has not attended any training or doctor's appointments to learn how to care for" a child with cystic fibrosis. Mother asserted that she had scheduled a future appointment with a doctor to learn about cystic fibrosis, but no evidence beyond her testimony, which the trial court concluded was not credible, was presented in support of this assertion. Alternatively, the trial court noted that Foster Mother has obtained significant training in caring for a child with cystic fibrosis and ensures that he receives proper treatment with specialists "to ensure that Dayson stays alive and thrives." The trial court noted that Dayson "depends on [Foster Mother] to properly provide and administer his life-saving

medical treatments." The trial court observed that, under Foster Mother's care, Dayson has "made significant medical strides and is no longer on a feeding tube." While Dayson has made these strides with Foster Mother, the trial court observed that Mother failed to follow up regarding Dayson's treatment. The trial court also concluded that Dayson simply does not know Mother and that "[s]he is a stranger" to him. The trial court found that Mother's custody posed a substantial risk of physical and psychological harm. Given Mother's lack of "interest in being trained to care for her child," the trial court found that mother posed "a risk of substantial harm or even death for Dayson." The trial court also reasoned that "it would be psychologically damaging to take Dayson, a medically fragile child from the only safety and security that he has known (the foster parents) and place him with [Mother], whose only connection to him is genetic." Ultimately, the trial court concluded that the failure to manifest an ability and willingness to assume custody ground was supported by clear and convincing evidence.

Having found three grounds for termination of Mother's parental rights, the trial court considered whether terminating Mother's parental rights was in Dayson's best interest. After analyzing the statutory best interest factors, the trial court concluded that termination of Mother's parental rights would be in Dayson's best interest.

Mother appealed. Mother argues that none of the three grounds for termination found by the trial court are supported by the record and that the termination of her parental rights is not in Dayson's best interest.

II.

Parents have a fundamental constitutional interest in the care and custody of their own children. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). This fundamental interest is "far more precious than any property right." *In re Carrington H.*, 483 S.W.3d at 522 (quoting *Santosky v. Kramer*, 455 U.S. 745, 758-59 (1982)). "[P]ublic policy strongly favors allowing parents to raise their biological or legal children as they see fit, free from unwarranted governmental interference." *In re Bernard T.*, 319 S.W.3d 586, 597 (Tenn. 2010). However, a parent's rights are not absolute and may be terminated on clear and convincing evidence that statutory grounds for termination exist and that termination is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c)(1)-(2); *In re Adoption of Angela E.*, 402 S.W.3d 636, 639 (Tenn. 2013).

In a termination of parental rights case, we review a trial court's findings of fact de novo on the record with a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *see* Tenn. R. App. P. 13(d). "In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483

S.W.3d at 524 (citing *In re Bernard T.*, 319 S.W.3d at 596-97). The grounds for termination and the determination that termination is in the child's best interest must be established by clear and convincing evidence, that is, evidence that "enables the fact-finder to form a firm belief or conviction regarding the truth of the facts" and that "eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596; Tenn. Code Ann. § 36-1-113(c). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

III.

Here, the trial court found that DCS presented clear and convincing evidence that established three grounds for terminating Mother's parental rights: abandonment by failure to visit, abandonment by failure to support, and failure to manifest an ability and willingness to assume custody. On appeal, Mother challenges the trial court's reasoning with respect to each termination ground. We address each in turn.

A. Abandonment by Failure to Visit

The trial court found that DCS presented clear and convincing evidence that Mother abandoned Dayson by failing to visit him. *See* Tenn. Code Ann. § 36-1-113(g)(1) (effective July 1, 2022, to May 4, 2023).[5] Abandonment occurs when a parent fails to visit his or her child "[f]or a period of four (4) consecutive months immediately preceding" the filing of the termination petition. Tenn. Code Ann. § 36-1-102(1)(A)(i) (effective July 1, 2022, to May 4, 2023). Here, the trial court found during the relevant four-month period for assessing this ground that Mother did not visit Dayson once during that period. The trial court found that Mother was not jailed or otherwise incapacitated during that period such that she could not visit Dayson. That conclusion is supported by the record. Simply stated, Mother's conduct fits the statutory definition of abandonment. *See id.*

In challenging this finding on appeal, Mother does not dispute the conclusion that she did not visit Dayson but argues that her failure to visit Dayson was not willful, which she raised as an affirmative defense. Mother contends "her failure to visit was not willful in any way because [Dayson] was placed in the care of multiple foster families, living as far away as Shelby County," because "[t]he extended distance of travel to Savannah, Tennessee located in Hardin County to Shelby County (approximately 90 miles) to exercise visitation was a substantial obstacle," and because she "did not have a driver's license, and

---

[5] *See In re J.S.*, No. M2022-00142-COA-R3-PT, 2023 WL 139424, at *6 (Tenn. Ct. App. Jan. 10, 2023), *perm. app. denied* (Tenn. Apr. 4, 2023) ("This court applies the versions of the parental termination statutes in effect on the date the petition was filed.").

the Department ceased to provide transportation for her."

Mother's arguments touch on two separate but interrelated concepts. One, Mother asserts that she did not have the means or ability to visit Dayson due to her own lack of transportation. Two, Mother asserts that DCS placed Dayson far enough away from her that visiting him was impracticable and that DCS at some point "ceased to provide transportation for her," which resembles an interference-style argument. Mother bore the burden to prove her affirmative defense of lack of willfulness by a preponderance of the evidence. *See* Tenn. Code Ann. § 36-1-102(1)(I) ("The parent . . . shall bear the burden of proof that the failure to visit or support was not willful. Such a defense must be established by a preponderance of the evidence.").

The trial court did not err in concluding that Mother failed to meet her burden to show that her failure to visit was not willful. Insofar as Mother argued that she lacked her own method of independently traveling to see Dayson, her argument is not compelling given the fact that DCS made resources available to Mother so that she could visit Dayson even without having an independent means of transportation. The trial court did not find credible Mother's testimony that she did not visit because she was unable to do so. DCS employees instructed Mother to let them know that she wanted to visit Dayson at least three days in advance so that they could communicate with Southwest Transportation Services. The trial court found that Mother "made no attempts to contact DCS concerning visitation [in the] four (4) months prior to the filing of the petition."

Insofar as Mother asserts that DCS frustrated her visitation efforts, that argument is ultimately unavailing for several reasons. The Tennessee Supreme Court has held that "a parent who attempted to visit and maintain relations with his child, but was thwarted by the acts of others and circumstances beyond his control, did not willfully abandon his child." *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007) (citing *In re Swanson*, 2 S.W.3d 180, 189 (Tenn. 1999)). "A parent's failure to visit may be excused by the acts of another only if those acts actually prevent the parent from visiting the child or constitute a significant restraint or interference with the parent's attempt to visit the child." *In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *5 (Tenn. Ct. App. July 22, 2020) (quoting *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)); *In re Mattie L.*, 618 S.W.3d 335, 350 (Tenn. 2021) ("Failure to visit is not willful if it is the result of coercion."). DCS, however, contracted with Southwest Transportation Services and made that resource available to Mother to facilitate her needed transportation. Mother made use of that resource at least once, which demonstrates her awareness of the fact that DCS tried to help facilitate her visits. As noted above, DCS employees instructed Mother to let them know that she wanted to visit Dayson at least three days in advance so that they could communicate with Southwest Transportation Services, but Mother failed to take that step. Even looking beyond the four months immediately preceding the date that the petition was filed, *see In re Alex B.T.*, No. W2011-00511-COA-R3-PT, 2011 WL 5549757, at *6 (Tenn. Ct. App. Nov. 15, 2011) (noting courts analyzing interference arguments "often consider

- 10 -

events that occurred prior to the relevant period"), Mother's last visit with Dayson was in January of 2022, which was nearly a year before the abandonment period even began. Despite being out of jail and working, as reflected by her August through November 2022 support payments, Mother never visited Dayson once during those months.

Additionally, the trial court did not credit Mother's testimony regarding her allegations that DCS impeded her ability to see Dayson by placing him in foster placements great distances away or, as she alleged at one point during her testimony, by cancelling her Southwest Transportation Services contract. "One of the most time-honored principles of appellate review is that trial courts are best situated to determine the credibility of the witnesses and to resolve factual disputes hinging on credibility determinations." *Mitchell v. Archibald*, 971 S.W.2d 25, 29 (Tenn. Ct. App. 1998). As stated by the Tennessee Supreme Court, "[w]hen it comes to live, in-court witnesses, appellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are 'uniquely positioned to observe the demeanor and conduct of witnesses.'" *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014) (quoting *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000)). In conducting this deferential review, "a trial court's determination of credibility will not be overturned on appeal unless there is clear and convincing evidence to the contrary." *Allstate Ins. Co. v. Tarrant*, 363 S.W.3d 508, 515 (Tenn. 2012). The record in this case provides no such basis for concluding that the trial court's credibility assessment was erroneous.

The record supports the trial court's conclusion that Mother abandoned Dayson by failure to visit. Regarding Mother's contention that this failure to visit was not willful, the record does not support Mother's contention that she demonstrated an absence of willfulness by a preponderance of the evidence. Having reviewed the record, we conclude the trial court did not err in finding the ground of abandonment by failure to visit to have been proven by clear and convincing evidence.

B. Abandonment by Failure to Support

The trial court also found that DCS presented clear and convincing evidence that Mother abandoned Dayson by failing to support him. Tenn. Code Ann. § 36-1-113(g)(1). Failure to support is defined as "the failure, for a period of four (4) consecutive months, to provide monetary support or the failure to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). Failure to support occurs when a parent fails to support his or her child "[f]or a period of four (4) consecutive months immediately preceding" the filing of the termination petition. Tenn. Code Ann. § 36-1-102(1)(A)(i). Here, it is undisputed that Mother did not make any monetary payment toward supporting Dayson's upbringing between the relevant statutory abandonment period of December 2022 to April 2023. As DCS established, Mother only ever made three payments towards Dayson's support, and none of them occurred during the operative period. This meets the statutory definition of abandonment by failure to support. *See* Tenn.

- 11 -

Code Ann. § 36-1-102(A)(i), (1)(D).

On appeal, Mother asserts that her failure to pay support was not willful because she lost her stream of income due to a job loss. Mother bears the burden to demonstrate by a preponderance of the evidence that her failure to support was not willful . *See* Tenn. Code Ann. § 36-1-102(1)(I) ("The parent . . . shall bear the burden of proof that the failure to visit or support was not willful. Such a defense must be established by a preponderance of the evidence.") While counsel did question DCS's witnesses regarding whether Mother losing her job may have affected her ability to pay child support, they noted that Mother "could still work, get another job." Based upon the evidence, the trial court found that Mother "is able-bodied and capable of working and earning enough to support herself as well as paying child support." The trial court noted that Mother even "testified that she was capable of supporting the child during the periods that she was released from incarceration." The trial court concluded that Mother "was not in jail or incapacitated in the four months immediately preceding the filing of the petition, and she could have worked and supported the child." The record supports the trial court's findings, and we cannot conclude that the trial court erred in determining that Mother failed to demonstrate that her failure to support was not willful.

DCS proved that Mother failed to provide support during the statutorily relevant period. The trial court did not err in concluding that Mother failed to satisfy her burden of her affirmative defense of lack of willfulness. Having reviewed the record, we conclude the ground of abandonment by failure to support was proven by clear and convincing evidence.

### C. Failure to Manifest an Ability and Willingness to Assume Custody

The trial court also found clear and convincing evidence to support terminating Mother's parental rights based on her failure to manifest an ability and willingness to assume custody of Dayson. *See* Tenn. Code Ann. § 36-1-113(g)(14). To satisfy this ground, two prongs must be proven by clear and convincing evidence: (1) the parent or legal guardian failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and (2) placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child. *Id.*; *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020).

The Tennessee Supreme Court has indicated the statute places a "conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child." *In re Neveah M.*, 614 S.W.3d at 677. Failure of the parent to manifest either ability or willingness will

- 12 -

satisfy the first prong.[6]  *Id.*  "Ability focuses on the parent's lifestyle and circumstances," while willingness revolves around a parent's attempts "to overcome . . . obstacles" preventing the parent from assuming custody.  *In re Serenity W.*, No. E2018-00460-COA-R3-PT, 2019 WL 511387, at \*6 (Tenn. Ct. App. Feb. 8, 2019).  A parent's express desire to reunite with the child is insufficient to establish a willingness to assume custody.  *See In re Nicholas C.*, No. E2019-00165-COA-R3-PT, 2019 WL 3074070, at \*17 (Tenn. Ct. App. July 15, 2019).  To the contrary, "[w]hen evaluating willingness, we look for more than mere words."  *In re Jonathan M.*, No. E2018-00484-COA-R3-PT, 2018 WL 5310750, at \*5 (Tenn. Ct. App. Oct. 26, 2018).  This court instead considers a parent's efforts to overcome any obstacles standing in the way of assuming custody or financial responsibility.  *In re Jaxx M.*, No. E2018-01041-COA-R3-PT, 2019 WL 1753054, at \*9 (Tenn. Ct. App. Apr. 17, 2019) (quoting *In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at \*8 (Tenn. Ct. App. Mar. 22, 2019)).  A failure to make efforts to overcome such obstacles "can undercut a claim of willingness."  *Id.*  As for the second prong, a substantial risk of harm requires "a real hazard or danger that is not minor, trivial, or insignificant" and requires the harm to be more than a "theoretical possibility" to be "sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not."  *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001); *see In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at \*8 (Tenn. Ct. App. Apr. 4, 2018).

Here, the trial court found that Mother lacked both an ability and a willingness to assume custody of Dayson.  We agree.  At the time that the trial court entered its final order, Mother had returned to her incarcerated status on a ten-year sentence stemming from the sale of methamphetamine.  We have noted that the "[f]ailure to provide safe and stable housing has been identified as both a basis for finding a lack of ability to assume custody and as a basis for concluding that there is a risk of substantial harm to [the] child."  *In re Temperance A.*, No. M2023-00641-COA-R3-PT, 2024 WL 2891918, at \*16 & nn.11-12 (Tenn. Ct. App. Jun. 10, 2024) (collecting cases).  Mother also failed to visit or provide support for Dayson.  Despite Dayson having a severe medical condition that requires treatment and regular medical visits, Mother has failed to take action to educate herself about how to care for a child with cystic fibrosis.  While Mother asserted that she had finally made an appointment to learn about cystic fibrosis, she provided no evidence of such an appointment having been made beyond her testimony, which the trial court found to be lacking in credibility.  While Mother has a desire to reunite with Dayson, the record supports the trial court's conclusion that she lacks an ability and willingness to do so.

---

[6] Mother disagrees with this aspect of the framework for analysis of this ground.  In support of this position, she cites *In re Ayden S.*, No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at \*7 (Tenn. Ct. App. May 31, 2018), *overruled by In re Neveah M.*, 614 S.W.3d at 662, 677, for the proposition that the burden fell on DCS to prove that Mother lacked *both* the ability and the willingness to assume custody of Dayson.  However, that case was expressly overruled by the Tennessee Supreme Court's *In re Neveah M.* decision based on the Court's disagreement with the precise proposition that Mother cites *In re Ayden S.* to support.  *See In re Neveah M.*, 614 S.W.3d at 662, 677 ("[W]e overrule *In re Ayden S.*").

- 13 -

The trial court also found, and the record supports, that returning Dayson to Mother's custody would pose a risk of substantial physical and psychological harm. When Dayson was in Mother's care, she failed to take Dayson to the follow-up appointment for cystic fibrosis testing with LeBonheur. In the wake of his diagnosis, she has not "attended any training or doctor's appointments to learn how to care for cystic fibrosis." For years, DCS encouraged Mother to learn more about cystic fibrosis, to engage in Dayson's care, and to begin equipping herself to take care of a child with Dayson's condition. Mother failed to do so. By contrast, Dayson's Foster Mother "ensures that [he] receives twice daily medical treatments, she ensures that he attends his regular medical appointments with various specialists to ensure that Dayson stays alive and thrives." The trial court found that Dayson "depends on [Foster Mother] to properly provide and administer his life-saving medical treatments." As the trial court noted, cystic fibrosis is "a chronic, life-threatening medical condition that requires twice daily treatments and regular doctor's appointments." If Dayson were removed from his currently supportive environment and placed into an environment where it was not guaranteed that his caretaker possessed the capabilities, diligence, and aptitude to care for him, the risk of harm is substantial and could be catastrophic.

The trial court also noted a risk of substantial harm that reuniting Mother and Dayson posed through the psychological harm of reuniting Dayson with a stranger. The testimony at trial indicates that Dayson has formed a parental attachment to Foster Mother that he does not have with Mother. We have previously held that forcing a child to return to the custody of an effective stranger poses inherent harm. *See, e.g., In re Cedrik C.*, No. M2024-00736-COA-R3-PT, 2025 WL 659262, at *8 (Tenn. Ct. App. Feb. 26, 2025) ("This court has regularly noted the risk of serious harm to children caused by reuniting them with a parent they do not know."); *In re Royalty Y.*, No. W2023-01333-COA-R3-PT, 2024 WL 2042496, at *7 (Tenn. Ct. App. May 8, 2024) (upholding determination of substantial psychological harm based upon concern about reuniting parent with a child who did not have a meaningful relationship with the parent and where the child was bonded with foster parents who wished to adopt); *In re Kaitlyn D.*, No. M2023-00658-COA-R3-PT, 2024 WL 1049483, at *14 (Tenn. Ct. App. Mar. 11, 2024) (upholding determination of substantial psychological harm based upon reuniting parent with child who did not have a meaningful relationship with the parent and where the child was bonded with another caregiver who wished to adopt); *In re Chance B.*, No. M2023-00279-COA-R3-PT, 2024 WL 764015, at *10 (Tenn. Ct. App. Feb. 26, 2024), *perm. app. denied* (Tenn. May 23, 2024) (noting a serious psychological harm from reuniting children with a parent with whom they have no relationship). That concern is present in this case.

Having reviewed the record, we conclude the trial court did not err in finding that clear and convincing evidence supported a finding of Mother's lack of ability and willingness to assume custody ground for termination.

Having concluded that at least one statutory ground for termination has been shown against Mother by clear and convincing evidence, our focus now shifts to what outcome is in Dayson's best interest. *See In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005). The Tennessee Supreme Court has summarized the law regarding the best interest analysis as follows:

> Facts considered in the best interest analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . . ."
>
> Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017) (citations omitted).

The nonexclusive factors relevant to the best interest analysis are laid out in Tennessee Code Annotated section 36-1-113(i)(1):

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the

circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

Tenn. Code Ann. § 36-1-113(i)(1) (effective Apr. 10, 2023, to May 4, 2023).

After reviewing this list of factors, the trial court concluded that terminating Mother's parental rights was in Dayson's best interest. Addressing the statutory factors, the trial court made the following findings:

[] The best interest factor contained in T.C.A. § 36-1-113(i)(1)(A) is applicable in this matter and weighs in favor of termination. Specifically, termination of parental rights will have a positive impact on the child's critical need for stability and continuity of placement throughout the child's minority. Dayson has a critical need for stability and continuity. The child is stable, secure and safe with the foster parents. His father has taken no steps to assume legal and physical custody of his child, while his mother has taken very limited steps. However, the mother is currently incarcerated on a ten-year sentence. [Mother's] incarceration negatively impacts the child's critical need for stability and continuity. Thus, this factor weighs in favor of

- 17 -

termination of parental rights.

[] The best interest factor contained in T.C.A. § 36-1-113(i)(1)(B) is applicable in this matter. In this case, a change of caregivers and physical environment from the child's current placement would likely have a negative effect on the child's emotional, psychological, and/or medical condition. The child is bonded to his foster family. His foster family is pre-adoptive. The child has a chronic medical condition, cystic fibrosis, that requires daily care and regular doctor visits. Neither parent has visited the child since 2022 and neither parent has taken any steps to learn how to care for cystic fibrosis. Thus, this factor weighs in favor of termination of parental rights.

[] The best interest factor contained in T.C.A. § 36-1-113(i)(1)(C) is applicable in this matter. In this case, [Mother] and [Father] have not demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs. Neither of the parents[] have demonstrated that they can meet this child's basic material needs, such [as] food, clothes and shelter. [Mother] is incarcerated and even prior to incarceration did not provide a safe environment for her child. She did not attend to his very basic medical needs for his serious medical conditions. Although, she was employed, she only has paid $315.00 in child support over the course of two years. [Father] has done nothing for this child over the three (3) years, the child has been in custody. Thus, this factor weighs in favor of termination of parental rights.

[] The best interest factor contained in T.C.A. § 36-1-113(i)(1)(D) is applicable in this matter. [Mother] and [Father] and the child do not have a secure and healthy parental attachment; and there is no reasonable expectation that [Mother] and [Father] will be able to create such an attachment. [Mother] and [Father] have not visited with the child in two years. [Mother and Father] have not provided the child with birthday gifts, Christmas gifts, etc. Just prior to the March 20, 2024 Termination hearing, Dayson celebrated his third birthday . . ., however, neither [Mother nor Father] sent a simple card or letter to acknowledge the child's birthday. [Mother and Father] are strangers to the child. Thus, this factor weighs in favor of termination of parental rights.

[] The best interest factor contained in T.C.A. § 36-1-113(i)(1)(E) is applicable in this matter. [Mother] and [Father] have not maintained regular visitation or other contact with the child and have not used visitation or contact to cultivate a positive relationship with the child. Neither [Mother] nor [Father] have visited the child in two years. Thus, this factor weighs in favor of termination of parental rights.

[] The best interest factor contained in T.C.A. § 36-1-113(i)(1)(F) is applicable in this matter. At this stage of life, the child would likely be fearful of living with either [Mother] or [Father] because [he] has not even seen them in two years.

[] The best interest factor contained in T.C.A. § 36-1-113(i)(1)(G) is not applicable in this matter and does not weigh in favor of, or against, termination.

[] The best interest factor contained in T.C.A. § 36-1-113(i)(1)(H) is applicable in this matter. The child has created a healthy parental attachment with another person or persons in the absence of the parent. The child has a healthy parental attachment with his pre-adoptive foster parents. He calls them mother and father and relies on them for care. They participate in regular activities with the child and provide daily care for his medical condition. He is bonded to their other son and extended family. Thus, this factor weighs in favor of termination of parental rights.

[] The best interest factor contained in T.C.A. § 36-1-113(i)(1)(I) is applicable in this matter. The child does have emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings. Termination of parental rights would likely affect those relationships as follows: Dayson has a relationship with his foster parents' other child. Termination of parental rights would have a positive effect on this relationship as Dayson will be adopted by the foster parents and become the legal brother of his foster sibling. Termination of parental rights would have no negative impact, as far as the child's heritage is concerned, because there is no specific heritage identified for the child. Thus, this factor weighs in favor of termination of parental rights.

[] The best interest factor contained in T.C.A. § 36-1-113(i)(1)(J) is not applicable in this matter and does not weigh in favor of, or against, termination.

[] The best interest factor contained in T.C.A. § 36-1-113(i)(1)(K) is applicable in this matter. [Mother] and [Father] have not taken advantage of available programs, services, or community resources to assist them in making a lasting adjustment of circumstances, conduct, and/or conditions. Thus, this factor weighs in favor of termination of parental rights.

[] The best interest factor contained in T.C.A. § 36-1-113(i)(1)(L) is applicable in this matter. The Department has made reasonable efforts to

- 19 -

assist [Mother] in making a lasting adjustment in [her] conduct or circumstances; but, despite these efforts, [Mother] and [Father] have made no change in their conduct or lifestyle. The Department facilitated visitation and attempted to engage the parents in understanding the child's medical condition. The Department created permanency plans with actions steps for the parents. The parents have not completed the steps required to reunify the family. The mother testified that she had completed very limited permanency plan tasks such as the LARC class and was working on completing parenting classes. After nearly three (3) years of this child being in DCS custody, [Mother] has not completed parenting classes or other permanency plan requirements. [Mother] is in substantial non-compliance in completing the permanency plans. Neither parent has had any training or education regarding the child's cystic fibrosis treatment. Thus, this factor weighs in favor of termination of parental rights.

[] The best interest factor contained in T.C.A. § 36-1-113(i)(1)(M) is not applicable in this matter and does not weigh in favor of, or against, termination.

[] The best interest factor contained in T.C.A. § 36-1-113(i)(1)(N) is applicable in this matter. [Mother] has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child as the child tested positive for THC at the time of birth. Further, there were allegations of domestic abuse by and between the parents. Thus, this factor weighs in favor of terminating parental rights.

[] The best interest factor contained in T.C.A. § 36-1-113(i)(1)(O) is applicable in this matter. [Mother] and [Father] have not ever provided safe and stable care for the child. Thus, this factor weighs in favor of termination of parental rights.

[] The best interest factor contained in T.C.A. § 36-1-113(i)(1)(P) is applicable in this matter. [Mother] and [Father] have not demonstrated an understanding of the basic and specific needs required for the child to thrive. Neither of them ever received any training regarding the child's medical condition. Thus, this factor weighs in favor of termination of parental rights.

[] The best interest factor contained in T.C.A. § 36-1-113(i)(1)(Q) is applicable in this matter. [Mother] and [Father] have failed to demonstrate the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive. Thus, this factor weighs in favor of terminating parental rights.

[] The best interest factor contained in T.C.A. § 36-1-113(i)(1)(R) is applicable in this matter. The physical environment of [Mother]'s home and of [Father]'s home is not healthy and safe for the child as neither parent has demonstrated an understanding of the needs of a child with cystic fibrosis. Thus, this factor weighs in favor of terminating parental rights.

[] The best interest factor contained in T.C.A. § 36-1-113(i)(1)(S) is applicable in this matter. [Mother] has failed to consistently provide more than token financial support for the child. During the time that this child has been in DCS custody, [Mother] only paid three (3) months of child support in the amount of $315.00. Thus, this factor weighs in favor of terminating parental rights as to [Mother].

[] The best interest factor contained in T.C.A. § 36-1-113(i)(1)(T) is not applicable in this matter and does not weigh in favor of, or against, termination.

Ultimately, the trial court concluded that "[h]aving evaluated all relevant best interest factors in T.C.A. § 36-1-113(i), there is clear and convincing evidence that it is in the best interest of the minor child for the parental rights of Mother . . . and Father . . . to be forever terminated."

In considering this decision, the determination of a child's best interest "may not be reduced to a simple tallying of the factors for and against termination." *See In re Chayson D.*, No. E2022-00718-COA-R3-PT, 2023 WL 3451538, at *15 (Tenn. Ct. App. May 15, 2023). Rather, a court must determine, after completing a holistic assessment of the record, whether terminating a particular parent's rights would be in a particular child's best interest. *Id.* This court has repeatedly indicated that "[o]ften, the lack of a meaningful relationship between a parent and child is the most important factor in determining a child's best interest." *In re London B.*, No. M2019-00714-COA-R3-PT, 2020 WL 1867364, at *12 (Tenn. Ct. App. Apr. 14, 2020).[7]

While there are individual factors as to which the trial court's analysis could be questioned, the correctness of the trial court's ultimate assessment and the thrust of its analysis is well-reasoned and plainly supported by the record. Dayson is a child who because of his serious medical condition has special and significant needs. With the love,

---

[7] *See also, e.g.*, *In re Krisley W.*, No. E2022-00312-COA-R3-PT, 2023 WL 2249891, at *11 (Tenn. Ct. App. Feb. 28, 2023); *In re Charles B.*, No. W2020-01718-COA-R3-PT, 2021 WL 5292087, at *11 (Tenn. Ct. App. Nov. 15, 2021); *In re Lauren F.*, No. W2020-01732-COA-R3-PT, 2021 WL 5234712, at *14 (Tenn. Ct. App. Nov. 10, 2021); *In re Christopher L.*, No. M2020-01449-COA-R3-PT, 2021 WL 4145150, at *9 (Tenn. Ct. App. Sept. 13, 2021); *In re Miley D.*, No. M2020-01416-COA-R3-PT, 2021 WL 2948776, at *6 (Tenn. Ct. App. July 14, 2021); *In re Cortez P.*, No. E2020-00219-COA-R3-PT, 2020 WL 5874873, at *12 (Tenn. Ct. App. Oct. 2, 2020).

support, and care of his foster family, despite the challenges, Dayon is impressively thriving in this foster home. A close attachment has developed between Dayson and his foster family, which is a pre-adoptive home. Alternatively, Mother has failed to visit or support Dayson. As found by the trial court, she is "a stranger" to him. Regarding understanding his needs and ensuring that he receives appropriate care, Mother started poorly by failing to obtain the recommend testing to determine if Dayson, who had been hospitalized after birth for 45 days, had cystic fibrosis. Then after his diagnosis, and throughout his years in foster care, Mother has failed to take action to learn about cystic fibrosis or how to care for a child with cystic fibrosis. While she purported to have finally made an appointment with a doctor to learn more, the only evidence offered in support of such an appointment being made was her testimony, which the trial court found to be lacking in credibility. The trial court quite properly concluded that placing Dayson in her care would create a serious risk of substantial harm and even death. Additionally, rather than cleaning up her life and avoiding criminal wrongdoing as required under her permanency plan, Mother continued to persist in violating the conditions of release and was reincarcerated. We do not question or doubt that Mother loves Dayson and desires to be with him, but as the trial court found her actions simply do not correspond with this aspiration. It is the best interest of the child and not the parent that is to be considered, and we conclude the trial court quite properly determined that clear and convincing evidence supports the conclusion that it is in Dayson's best interest to terminate Mother's parental rights.

V.

For the reasons discussed above, we affirm the judgment of the trial court in terminating Mother's parental rights. The costs of the appeal are taxed to the appellant, Tonica A., for which execution may issue if necessary. The case is remanded for further proceedings consistent with this opinion.


s/ Jeffrey Usman
JEFFREY USMAN, JUDGE